REM–CRU TITANIUM, Inc., Plaintiff,

v.

Robert C. WATSON, Commissioner of
Patents, Defendant.

Civ. A. No. 1699–54.

United States District Court
District of Columbia.

Dec. 21, 1956.

J. Austin Stone, Washington, D. C.,
for plaintiff.

E. L. Reynolds, Washington, D. C., for
defendant.

CURRAN, District Judge.

This is a civil action brought by the
plaintiff, Rem-Cru Titanium, Inc., against
the defendant, Robert C. Watson, Com-
missioner of Patents, pursuant to Title
35, Section 145 of the United States
Code, to authorize the Commissioner of
Patents to issue to the plaintiff letters
patent, containing Claims 5, 6, 7 and 8
of an application, Serial No. 187,370, en-
titled "Titanium Alloy", filed September
28, 1950, by Robert I. Jaffee, Horace R.
Ogden and Daniel L. Maykuth. This ap-
plication has been assigned to Rem-Cru
Titanium, Inc., plaintiff herein. Claims
5 and 6 were withdrawn by plaintiff at
the trial, leaving Claims 7 and 8 for con-
sideration by the Court.

The subject matter of the application is an alloy of titanium and aluminum, in which the aluminum content is present within a certain range of proportions, namely, in the amount of 34% to 46% by weight of the total alloy. The specification discloses that titanium alloys with the indicated proportions of aluminum have a single phase, face centered, tetragonal microstructure. Further, the specification indicates that these alloys maintain their room temperature hardness at temperatures as high as 1250°C or 2300°F and are resistant to oxidation at elevated temperatures. The claims describe the titanium alloy by percentage range of aluminum and by reference to the alloy's ability to maintain its hardness when heated and its high resistance to oxidation, or by reference to these advantages and additional reference to crystalline structure and ultimate strength.

Claims 7 and 8 were rejected by the Examiner as being unpatentable over the United States patent to Gray, No. 2,299,228, dated October 20, 1942; the Hansen publication, "Aufban der Zweis-tofflegierunger" (1943); and Science Abstracts, Section A, Physics, Vol. VI, 1903. These rejections were affirmed by the Board of Appeals of the Patent Office.

The more specific of the two claims is Claim 8, its essential elements being: a titanium base alloy containing about 34–46% of aluminum; characterized in having a single phase, face centered, tetragonal microstructure; an ultimate strength at room temperature of at least 126,000 psi (pounds per square inch); being highly resistant to oxidation at elevated temperatures; and maintaining substantially its room temperature hardness at elevated temperatures as high as 1250°C. Claim 7 covers the same range of alloys and their characteristics but omits recitation of the microstructure and the ultimate strength thereof.

Both claims are directed to a *critical* range of aluminum content which plaintiff contends defines a new alloy product, having the desired properties of high resistance to oxidation at elevated temperatures and maintenance of room temperature hardness at elevated temperatures.

Is there any teaching in the prior art of either the existence of this critical range of titanium aluminum alloys, or of the nature of the highly desirable characteristics as set forth in the application here, or of the existence of the single phase microstructure specified in Claim 8, which is uniform throughout this critical range of alloys?

### The Gray Patent

The patent of Gray describes the preparation of electric condensers by (a) pressing or agglomerating a multitude of metallic particles to form a porous spongy body, (b) covering or coating the surfaces of the body surrounding the pores with a dielectric layers, such as an oxide film, and (c) filling the pores of the body with a solid electrolyte. The patent states that the metallic particles may be "of the same composition or mixtures of two or more kinds of different composition or alloys." Gray describes the use of solid solutions or alloys of two or more materials:

"The skeleton metal can also be made, as mentioned above, of solid solutions or alloys of two or more metals. If one mixes e. g. approximately 85% to 95% aluminum with 15% to 5% beryllium and heats the mixture up to about 900° to 1050°C. then these metals form a melt which upon cooling forms a solid solution or mixed crystals. The two metals do not enter into a chemical combination but form in the main an alloy. Such an alloy is thereafter comminuted, shaped and fritted at a temperature of about 640° to 700°C. The skeleton thus obtained is then oxidized at the temperatures below the fritting temperature, and a dense and strong dielectric layer is obtained of which the dielectric constant lies above that of the aluminum oxide due to the presence of beryllium oxide.

"Titanium has the property to form an oxide possessing a very high

dielectric constant. By compounding it e. g. with aluminum, an aluminum-titanite AlTi, is obtained, which can be used for making a condenser in any way described above. The dielectric oxide layer produced on such a skeleton has a dielectric constant which lies considerably above that of aluminum oxide alone though below that of titanium oxide alone."

The Board held, with respect to the recitation of the properties of the alloy in the claims, that since the Gray alloy falls within the range of alloys recited in the claims, it is fair to assume that it possesses the same properties as the plaintiff's alloys.

## Hansen Publication

It is stated in this publication that Guillet assumed the existence of the compound $Al_3$ $Ti_2$ (54.2% Ti.) and that Weiss-Kaiser found the same compound on repeating Manchot-Richter experiments. The Patent Office held that this statement constitutes the disclosure of an alloy which is within the range of the alloys claimed by the plaintiff and which, therefore, negatives novelty in this range of alloys.

## Science Abstracts

" 'Titanium alloys—The mixture of Al and $TiO_2$ only inflames after heating to 600°, and to obtain an ingot or alloy it is necessary to superheat the top of the mixture by means of a jet of oxygen. Compounds isolated were $TiAl_4$ and $Ti_2O_3$ (or possibly TiAl analogous to SnAl)' ".

The Patent Office held that admitting, arguendo, that Guillet did not produce the alloy $Al_3Ti_2$ by the method used by him, the fact remains that he disclosed this alloy and that this disclosure per se is insufficient to negative invention in the alloy.

A reading of these prior arts disclosures reveals an absence of any teaching of the new alloy product claimed herein. There is no mention of a titanium-aluminum alloy having the claimed properties of high oxidation resistance and the retention of hardness at elevated tem-

peratures, or of high ultimate strength at atmospheric temperature, or of an alloy having the claimed unique single phase face centered microstructure, or of the critical nature of the claimed range of 34–46% aluminum in a titanium-aluminum alloy which defines a new product. There are isolated references which mention by name only AlTi and $Al_3Ti_2$ which happened to contain aluminum within the range of the claims in issue. There is no question that if the prior art shows a range which includes the range claimed in the instant application, in the absence of the production of a different product by plaintiff, plaintiff is not entitled to a patent.

The defendant takes the position that the aluminum titanite (AlTi) alloy of Gray falls within the range of 34–46% aluminum alloys described in the claim. Does this mean that simply because of such presence in the prior art of specific alloys falling within the range covered by the claims anticipation has been established?

The contention of the Patent Office that "with respect to the recitation of the properties of the alloys in the claims, since the Gray alloy falls within the range of allows recited in the, claims, it is fair to assume that it possesses the same properties", is without merit. (Italics supplied.)

The Patent Office has assumed the existence of the claimed properties, even though the prior art is devoid of any such suggestion. Such an assumption is unwarranted under the facts in this case. The requirements for clear disclosure vary according to the particular art involved. For the standard of clear disclosure to be met in alloy cases, the prior art must disclose the properties or characteristics of the claimed alloys so that there may be some teaching in the art of the criticalness of the range.

The Patent Office cannot impute to the disclosures of the prior art the production of a titanium aluminum alloy within plaintiff's range of proportions, having the recited properties or characteristics

thereof, which are specifically set forth in the claims herein.

Both the plaintiff and the defendant rely heavily upon Pittsburgh Iron & Steel Foundries Co. v. Seaman-Sleeth Co., 3 Cir., 1917, 248 F. 705, 706. In that case the patent concerned an alloy of iron containing certain critical proportions of carbon, silicon, chromium, nickel, phosphorous, manganese and sulfur, which resulted in the alloy having certain extraordinary properties, to wit, "it bridges the gap between irons and steels —having chemical characteristics more nearly approaching the former, with physical properties equal to if not excelling the highest grades of the latter." This novel alloy was called "Adamite." The Court upheld its validity even though "Alloys containing the ingredients of the claim appeared in the manufacture of iron and steel long before the patent."

The following language of the Court in the Pittsburgh case is most germane:

"The remaining question as to the patent's validity is whether the disclosed invention had been anticipated by alloys of the same formula in the prior art.

"The defendant found in the prior art and produced in evidence formulae and analyses of many iron and steel products, which were either within the analysis of the patent alloy or as close to it as is the analysis of the product of the defendant upon which the plaintiff bases its charge of infringement. These analyses appeared in patents, publications, and in the records of steel manufacturers kept in the regular course of their business. They are Hadfield Patents, Nos. 732,365 and 735,666; the Borchers Article; the Totten Patents, No. 872,483; 878,691; 947,263; Isaac G. Johnson Co.; Crucible Steel Co.; use of Mayari ore by Carpenter Steel Co., Maryland Steel Co., Reading Iron Co., and the defendant.

"To the voluminous evidence upon the defense of anticipation we have given careful study. We find it unnecessary to discuss the evidence in this opinion for the reason that all of it is fatally deficient in one essential, namely, in failing to show that the products of the several prior art analyses were Adamite.

"While showing products of varying characteristics and recording faithfully the progress of the art of steel making, the alleged anticipating alloys nowhere showed or even suggested when made or published that they were Adamite or were metals which possessed in structure or performance the Adamite characteristics of cast iron and steel, or suggested to the art either the existence of such a metal or how to make it. If any one of the alleged anticipating alloys was Adamite, that fact, so far as the record shows, was not known to those who produced it or used it, and not being recognized as a new product with its distinctive characteristics, its production was purely an accident without profit to the art and without value as an anticipation. We are satisfied, therefore, that Adamite has not been anticipated by alloys, which, while accidentally of the same analyses, were not shown to be the 'article of manufacture' of the patent.

"We are of opinion that Adamite is what it is said to be, namely, 'a new article of manufacture,' different from but similar to both cast iron and steel, that its production involves invention, and that claim 1 of the patent is valid."

In Becket v. Coe, 1938, 69 App.D.C. 51, 98 F.2d 332, the applicant was seeking claims on a critical range of chromium-manganese-nickel-copper ferrous alloys which had certain unique properties, i. e. both stainless and deep drawing. The prior art disclosed a range of the same alloying ingredients. The Court held that the references were inadequate to anticipate and that the prior art seems neither to have sought nor to have found an alloy which is both stainless and deep drawing." The Court also held that the Becket proportions were "critical." In

the instant case plaintiff's assignors claim proportions that are "critical." See also Ludlum Steel Co. v. Terry, D.C.N.Y.1928, 37 F.2d 153; General Electric Co. v. Hoskins Mfg. Co., 7 Cir., 1915, 224 F. 464; American Stainless Steel Co. v. Ludlum Steel Co., 2 Cir., 1923, 290 F. 103.

In the case of In re Tanczyn, 1953, 202 F.2d 785, 787, 40 C.C.P.A.Patents 886, three claims in the application for a patent directed to wrought and polished straight chromium steel products substantially free of surface defacing complex silicate inclusions were rejected by the Examiner, and his decision was affirmed by the Board of Appeals of the Patent Office. The issue raised there was whether the petitioner's claims were disclosed by the prior art. The Court of Customs and Patent Appeals answered this question in the negative, holding that although the prior art does show two specific alloy compositions falling within the range recited in petitioner's claims, there was no indication that the prior art was at all concerned with petitioner's purpose—that is, producing stainless steel products free of surface defects. The Court stated: "Not only does neither reference in any way suggest any solution for eliminating such defects, but neither indicates that the author even recognized that such a problem existed, or that he attempted to trace its source."

■ The claims in issue cover a critical range of proportions which this Court holds define a novel alloy having an unique microstructure and extraordinary new properties. The prior art, while it admittedly discloses compositions or alloys having chemical analyses falling within the range claimed here, does not suggest that those compositions were metals which possessed in structure or performance the characteristics of the alloys in the instant case. The prior art is defective as an anticipation.

In Torok v. Watson, D.C.D.C.1954, 122 F.Supp. 788, the claims were directed to a thermistor or temperature control device composed of two metal oxides, one being chromic oxide in critical propor-

tions. The prior art contained references to a thermistor material with chromic oxide as an ingredient but did not indicate the properties of the critical range of the chromic oxide there claimed. The court held that the applicant added something to the sum of human knowledge and held the claims patentable.

Here the range claimed is critical. Here plaintiff has developed a new alloy having extraordinary novel characteristics, the existence of which the prior art was unaware. These characteristics are so different and result in such widespread commercial uses that the alloys claimed differ in kind from anything heretofore known.

■ There is no question that a "different product", that is, one differing in kind rather than in degree, is essential for patentability, but it is the difference in properties or characteristics that illustrates this difference in kind.

■ The prior art disclosures cited by the defendant do not constitute anticipation because there is no showing that they possessed in structure or performance the characteristics of plaintiff's alloy. It is true that a reference need not disclose an operative process of manufacturing a product, provided the product itself is clearly disclosed.

■ When the claimed alloy properties or characteristics clearly evidenced the critical nature of the claimed range, isolated disclosures of alloys by name falling within that range will not serve as a basis for anticipation.

The prior art shows alloys having broad ranges which include the claimed ranges. However, the prior art does not disclose alloys having the extraordinary characteristics of plaintiff's alloy. Since the limited ranges of the plaintiff are critical to obtain the alloy disclosed, the claims should have been allowed.

The Patent Office and the Courts play important roles, by their decisions, in the creation of new industries. The inventor, whose mind conceives new ideas, advances the cause of science. Today, more

than ever before, there is a vital need to encourage the creation and the development of new industries. Congress already has the power to promote the progress of science by securing to inventors, for certain periods of time, the exclusive right to their discoveries. In his preface to Walker on Patents, Anthony William Deller says:

"As a result of * * * inventions, the United States has become the greatest nation in the world with a highly developed industrial system and a social system having the highest standard of living. If that system and that standard are to be preserved, the creation and discovery of inventions must be encouraged, and the granting and sustaining of patents to protect such inventions must not be disturbed."

██ Patents for inventions must receive a liberal construction and under "ut res magis valeat quam pereat" they are to be interpreted so as to uphold and not to destroy the right of the inventor. See Turrill v. Michigan S. & N. I. Railroad Co., 1 Wall. 68, 491, 510, 17 L.Ed. 668; Johns-Mansville Co. v. National Tank Seal Co., 10 Cir., 1931, 49 F.2d 142, 146, certiorari denied 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555; American Doucil Co. v. Twin City Water Softener Co., 8 Cir., 1929, 36 F.2d 673, 674, certiorari denied 281 U.S. 756, 50 S.Ct. 410, 74 L.Ed. 1166; Sun Ray Gas Corp. v. Bellows-Claude Neon Co., 6 Cir., 1931, 49 F.2d 886, 887; Smith v. Snow, 1935, 294 U.S. 1, 14, 55 S.Ct. 279, 79 L.Ed. 721.

"The court should proceed in a liberal spirit so as to sustain the patent and the construction claimed by the patentee himself, if this can be done consistently with the language which he has employed." Klein v. Russell, 19 Wall. 433, 466, 86 U.S. 433, 466, 22 L.Ed. 116.

"In a case of doubt, where the claim is fairly susceptible of two constructions, that one will be adopted which will preserve to the patentee his actual invention." McClain v. Ortmayer, 141 U.S. 419, 425, 12 S.Ct. 76, 78, 35 L.Ed. 800.

"The object of the patent law is to secure to inventors a monopoly of what they have actually invented or discovered, and it ought not to be defeated by a too strict and technical adherence to the letter of the statute, or by the application of artificial rules of interpretation." Topliff v. Topliff, 145 U.S. 156, 171, 12 S.Ct. 825, 831, 36 L.Ed. 658.

I find for the plaintiff. It is entitled to receive a patent for the invention as specified in Claims 7 and 8, and the Commissioner of Patents is authorized to issue a patent to the plaintiff upon compliance with the requirements of the law.

The findings of fact and conclusions of law being contained in this opinion, no formal findings of fact and conclusions of law are necessary. Counsel for plaintiff will prepare the appropriate judgment, not inconsistent with this opinion.